UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROGER DUANE MARTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:14-cv-0477** |
| | ) | **JUDGE WISEMAN** |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Pending before the Court is Plaintiff Roger Duane Martin's Motion for Judgment on the Administrative Record (Doc. No. 14), to which Defendant Social Security Administration (SSA) has responded (Doc. No 15). Plaintiff filed a reply to the SSA's response. (Doc. No. 16.) Upon consideration of the parties' briefs and the transcript of the administrative record (Doc. No. 10),[1] and for the reasons set forth below, Plaintiff's Motion for Judgment will be DENIED and the decision of the SSA will be AFFIRMED.

### I. Magistrate Judge Referral

In order to ensure the prompt resolution of this matter, the Court will VACATE the referral to the Magistrate Judge.

---

[1] Referenced hereinafter by "Tr." followed by the page number found in bolded typeface at the bottom right corner of the page.

## II. Introduction

Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act on May 2, 2007, alleging disability onset as of January 1, 2003. (Tr. 109.) Plaintiff subsequently amended his disability onset date to March 2, 2006. (Tr. 1010.) Plaintiff claimed that the following conditions limited his ability to work: Hypertensive Cardiovascular Disease/Hypertension; Multiple joint arthritis, Brittle Diabetes Impairment and Hyperthyroidism, Chronic Obstructive Pulmonary Disease, Pancreatitis, Asthma, GERD, Hyperlipidemia. (Tr. 112.) His claim to benefits was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of his case by an Administrative Law Judge (ALJ). The ALJ heard the case on January 9, 2009, when Plaintiff appeared with counsel and gave testimony. (Tr. 10-41.) Testimony was also received from an impartial vocational expert. (Id.) At the conclusion of the hearing, the matter was taken under advisement until February 27, 2009, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 45-52.) Plaintiff appealed the ALJ's decision to this Court in Roger Duane Martin v. Social Security Administration, Case No. 3:10-cv-0917 (M.D. Tenn. Oct. 1, 2010) (Nixon, J.) ("Martin I.") Plaintiff filed his Motion for Judgment on the Administrative Record on February 3, 2011. (Martin I, Doc. No. 12.) After obtaining several extensions of time, on June 17, 2011, Defendant filed a Motion to Remand to the Social Security Administration "for further administrative proceedings and development." (Martin I, Doc. No. 19.) On June 20, 2011, the Court granted Defendant's Motion and remanded the case to the Social Security Administration. (Martin I, Doc. 21.) On July 15, 2011, the Appeals Council issued an order remanding

Plaintiff's case to an ALJ for further consideration. (Tr. 957-61.) Specifically, the Appeals Council directed the ALJ to:

1. Further evaluate the evidence relating to the claimant's impairments, including his black out spells, diabetes mellitus, pancreatitis, pancreatic pseudocyst, and hypothyroidism, and assess any limitations therefrom.

2. Give consideration to the nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence.

3. Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 96-8p.

4. Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 404.1529 and Social Security Ruling 96-7p.)

5. Clarify whether Dr. Nutter was a licensed physician at the time that he performed his examination of the claimant.

(Tr. 960-61.)

The ALJ heard the case on July 16, 2012. (Tr. 890-919.) Plaintiff appeared with counsel and gave testimony. (Id.) Testimony was also received from an impartial vocational expert. (Id.) At the conclusion of the hearing, the matter was taken under advisement until October 9, 2012, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 873-882.) That decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2003[2] through his date last insured of June 20, 2008 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: COPD, degenerative disc disease of the lumbar spine, black out spells, diabetes mellitus, pancreatitis, pancreatic pseudocyst, multi-joint arthralgias, and hypothyroidism (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight hour workday; sit for six hours in an eight hour workday; can occasionally balance, stoop, kneel and climb ramps or stairs; never climb ladders, ropes or scaffolds; never crouch and crawl; and should avoid exposure to temperature extremes, vibration, dust, fumes, and other pulmonary irritants.

6. Through the date last insured, the claimant was capable of performing past relevant work as a cashier. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a "disability" as defined in the Social Security Act at any time from January 1, 2003, the alleged onset date, through June 30, 2008, the date last insured (20 CFR 404.1520(f)).

(Tr. 875-76, 881.)

On December 13, 2013, the Appeals Council denied Plaintiff's request for review of the

ALJ's decision (Tr. 862-65), thereby rendering that decision the final decision of the SSA. This

civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the

---

[2] Although the ALJ erred by stating the wrong onset date, January 1, 2003, she recognized the correct date, March 2, 2006, in the decision. (Tr. 873, stating "the claimant amended the alleged onset date of disability to March 2, 2006.").

ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. Id.

### III. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

The claimant testified that he was prescribed two forms of insulin between 2006 and 2008 for his diabetes. He testified that although he took his medications as prescribed, his blood sugars continued to range anywhere from 24 to 420. He said that between 2006 and 2008 he had to use a nebulizer four times a day. The claimant testified that doctors were not sure what caused his blackouts, but said that he felt they were related to his blood sugar. He testified that his blackout episodes lasted for about 15 minutes and afterwards made him feel drained and weak. The claimant said that between 2006 and 2008 he had pain in his lower left stomach that traveled up to his pancreas. He said that he was admitted to the hospital several times, during this time, for pancreatitis. The claimant testified that his pain between 2006 and 2008, on a scale of zero to ten, was an eight in severity. Interestingly, the claimant said that he was able to tolerate this pain and only took aspirin for the pain. The claimant testified that the VA prescribed him a cane in 2000. He testified that he had neuropathy in his feet back in 2006, and was able to feel the top of his foot, but not the bottom. He testified that back in 2006, he had to lie down four to five times a day for one to one and a half hours each time.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

On August 29, 2007, the claimant underwent a consultative examination with Dr. Stephen B. Nutter (Ex. 9F). The Appeals Council order indicates that there was a question as to the validity of Dr. Nutter's credentials at the time of the examination. However, a "licensee detail" from the West Virginia Board of Medicine indicates that Dr. Nutter's medical license was active at the time of the examination (Ex. 35F).

The claimant's medical history is remarkable for COPD, degenerative disc disease of the lumbar spine, black out spells, diabetes mellitus, pancreatitis,

5

pancreatic pseudocyst and hypothyroidism. However, the objective evidence fails to support the level of limitation alleged during the period in question. The undersigned has considered the record as a whole. Significant findings in the evidence include, but are not limited to the following:

The claimant has a history of poorly controlled diabetes, evidenced by periods of hypoglycemia, elevated blood glucose and A1C levels, and hospitalizations (Exs. 3F, p. 35 and 9F). The claimant also has a history of neuropathy in his hands and feet. Despite these findings, there is no evidence that the claimant's diabetes caused a substantial functional limitation upon the claimant during the period in question. For example, at a March 1, 2007 office visit, the claimant reported that he was doing chores for his landlady and walking five miles per day for exercise (Ex. 8F, p. 44). At an April 12, 2007 office visit, the claimant reported that he was delivering ice cream, and working on a truck (Ex. 8F, p. 30). Although the claimant was found to have some mobility and sensory abnormalities during the August 2007 consultative examination, his gait and station was normal. There was no atrophy in the claimant's hands and his grip strength was equal and normal bilaterally (Ex. 9F). In addition, notations in the claimant's medical records suggest that the abnormalities associated with the claimant's diabetes were largely attributable to periods in which the claimant failed to properly adhere to his treatment regimen (Exs. 8F, p. 44, 25F and 26F, p. 32). For instance, at a November 2006 office visit, the claimant reported that he "decreased his insulin . . . . and has not been using the aspart." [3] The claimant went on to tell his medical provider that he eats meals out and "doesn't want to carry insulin with him" (Ex. 3F, p. 63). At a March 2007 office visit, the claimant told the nurse that he had not been monitoring his blood sugars, and that he quit taking his insulin (Ex. 8F, p. 44).

The claimant has a history of blackout spells. The claimant's black out spells were initially treated with the medications Dilantin and Tegrotol (Exs. 3F, p. 63 and 9F) despite several CTs and MRI's of the claimant's head showing no significant findings and "EEG" results that failed to reveal any epileptiform abnormalities (Exs. 8F and 19F, p. 9). However, medical records suggest that the claimant's black out spells are associated with periods of uncontrolled blood sugar (Ex. 9F and 19F, p. 12). For instance, the claimant was seen for diabetes self-management on October 13, 2006. At this visit, the claimant reported a history of blackouts, with one the day before, but he was uncertain if his blackouts

---

[3] Insulin aspart is used to treat diabetes (Type 1 and Type 2). MedlinePlus [Internet]. Bethesda (MD): National Library of Medicine (US); [updated 2005 Aug 12; cited 2005 Aug 11]. Insulin Aspart (rDNA Origin) Injection [updated 2017 Feb 23]. Available from: https://medlineplus.gov/druginfo/meds/a605013.html (last visited March 3, 2017).

were related to hypoglycemia. The claimant reported finger sticks in the single digits without any symptoms or ill effects (Ex. 3F, p. 66). On November 1, 2006, the claimant presented to the Diabetes Clinic with reports of blackouts, the most recent occurring the previous Thursday lasting two hours. At this visit, the claimant told his medical provider that he "decreased his insulin. . . . and has not been using the aspart." The claimant went on to tell his medical provider that he eats meals out and "doesn't want to carry insulin with him" (Ex. 3F, p. 63). The claimant returned to the Diabetes Clinic on November 24, 2006 with reports that he has was taking his medication as directed and no hyperglycemia or blackouts since his last appointment (Ex. 3F, p. 62). Then on March 27, 2007, the claimant returned to the Diabetes Clinic with reports of having blackouts that occurred two to three times a week. The claimant told his medical provider that he was not monitoring his blood glucose levels, and that he stopped taking his insulin (Ex. 3F, p. 45). The claimant also reported that when his blood sugar drops he blacks out (Ex. 3F, p. 42). However, during this same visit, the claimant told his treating physician that the last time he had a blackout was two weeks prior to this visit. On April 16, 2007, the claimant returned to the Diabetes Clinic with reports of improvement in his finger sticks. However, the claimant said that he had one 30 mg/dl and blacked out (Ex. 3F, p. 30). Approximately six months later, the claimant presented to the Diabetes Clinic with reports of four blackouts in the past month. The claimant told his medical provider that he believed the blackouts are related to hypoglycemia (Ex. 12F, p. 14). The medical evidence showed that the claimant was seen on May 21, 2008, at the Primary Care Outpatient Clinic for follow up with reports that his blood sugars range from 27 to 400, and that he was having black out spells off and on, with the most recent episode two weeks earlier. Treatment notes illustrate that the claimant was last seen in June 2007. At this visit, the claimant was assessed with intermittent black out spell (Ex. 19F, p. 12).

Interestingly, the claimant's intermittent blackout episodes did not prevent him from engaging in physical work activities. As discussed further below, the claimant walked every day (Exs. 3F, p. 35 and 8F, p. 63), worked doing remodeling, did mechanical work on a friend's car, and worked as a security guard. He helped a friend with construction, and loaded and drove an ice cream truck for seven hours a day, seven days a week (Ex. 3F, p. 28, 12F, p. 15 and 20F, p. 40).

The record indicates that the claimant has been treated for recurrent pancreatitis, pancreatic pseudocyst and hypothyroidism. Importantly, medical records showed that the claimant's pyrosis was well controlled on medication, and the claimant's pseudocyst was minimally symptomatic and stable (Ex. 3F, p. 30). In addition, subsequent imaging results revealed a large stable pseudocyst (Ex. 22F, p. 2).

While laboratory testing showed elevated "TSH" levels, at a March 2008 office visit, the claimant admitted to taking only one tablet of Levothyroxine instead of taking two tablets as prescribed (Ex. 19F, p. 14). At a later office visit, the claimant admitted to being non-compliant with his hypothyroidism medications (Ex. 25F, p. 19). In fact, records showed that the claimant's hypothyroidism was well controlled and stable when compliant with medication (Ex. 3F, p. 58 and 8F, p. 57).

In addition, medical imaging showed degenerative disc disease of the lumbar spine with mild scoliosis (Exs. 6F, p. 8, 21F, p. 15 and 22F, p. 2). During the period in question, the claimant was treated for chronic low back pain with the medication Etodolac, and with a TENS unit (Ex. 3F, p. 39). While the claimant had decreased range of motion in his lumbar spine, straight leg raises were negative. The claimant ambulated with a normal gait and station and did not require a handheld assistive device (Ex. 9F). Medical records list the claimant's chronic low back pain as stable, and document decreased pain with use of the TENS unit (Ex. 3F, p. 64 and 12F, p. 20).

At an office visit on April 16, 2007, the claimant reported a history of left shoulder and left hand pain with intermittent left hand swelling. He also reported some pain in the left upper quadrant during palpation, but said that he is only "minimally bothered by this" (Ex. 8F, p. 29). Notably, the claimant admitted that his left shoulder pain and hand pain decreases throughout the day as he exercises (Ex. 8F, p. 29). Then at the August 2007 consultative examination, the claimant complained of joint pain in the wrists, elbows, shoulders, knees and ankles, and numbness in his hands. The claimant said that he was diagnosed with gout in the ankles, and reported flares of gout three to four times a year that last for two days in duration. Even so, a physical examination of the claimant revealed no substantial abnormalities. While the claimant had a small tender bony nodule on his left hand, his grip strength was normal bilaterally. The claimant was able to write and pick up coins with either hand without difficulty (Ex. 9F, p. 4). Although the claimant had difficulty balancing, and diminished sensation and decreased muscle strength in his toes, he was able to walk on his heels and toes, without using an assistive device (Ex. 9F, pgs. 4 and 6).

Moreover, there is no evidence that the claimant's low back pain or joint pain caused a substantial functional limitation upon the claimant during the period in question. As discussed above, the claimant walked every day (Exs. 3F, p. 35 and 8F, p. 63), worked doing remodeling, did mechanical work on a friend's car, and worked as a security guard. He helped a friend with construction, and loaded and drove an ice cream truck for seven hours a day, seven days a week (Ex. 3F, p. 28, 12F, p. 15 and 20F, p. 40).

8

The claimant also has a history of COPD and tobacco use. He was strongly urged to stop smoking on numerous occasions, but expressed his disinterest in quitting, and refused a referral to smoking cessation class (Exs. 12F, p. 20 and Ex. 19F, p. 9). At the August 2007 consultative examination, the claimant's lungs were clear to auscultation and respirations were even and unlabored. In addition, pulmonary testing showed improvement in the claimant's COPD post-bronchodilator (Ex. 9F). On December 16, 2007, the claimant presented to the emergency room with complaints of shortness of breath and wheezing. The claimant admitted that he was still actively smoking and had been out of his medications for the past eight weeks (Ex. 18F, pgs. 3, 7). Also, additional medical records noted the claimant's COPD as stable (Exs. 3F, p. 39, 58, 8F, p. 57 and 12F, p. 20).

The undersigned gives some weight to the claimant's testimony in finding him capable of no more than the reduced range of light exertion above. However, the undersigned does not fully credit the claimant's testimony for the following reasons:

As discussed above, there is no evidence that the claimant's severe physical impairments caused a substantial functional limitation upon the claimant during the period in question. In addition, notations in the claimant's medical records suggest that the abnormalities associated with the claimant's diabetes and black out spells were largely attributable to periods in which the claimant failed to properly adhere to his treatment regimen (Exs. 3F, 8F, p. 44, 12F, 25F-26F, p. 32). While the record shows that the claimant periodically complained of blackouts, the record also shows large periods in time during which the claimant made no complaints of blackouts. Thus, the gaps in the claimant's complaints suggest that his blackouts were not as severe as alleged. Further, the evidence demonstrates that the claimant's hypothyroidism was well controlled when the claimant was compliant with medication. Also, medical records showed that the claimant's COPD and pseudocyst were stable, and that the claimant's pancreatitis has been responsive to treatment. Additionally, the claimant's extensive activities of daily living are not reflective of the incapacitating limitation alleged. During the period in question, the claimant walked every day (Exs. 3F, p. 35 and 8F, p. 63), worked doing remodeling, did mechanical work on a friend's car, and worked as a security guard. He helped a friend with construction, and loaded and drove an ice cream truck for seven hours a day, seven days a week (Ex. 3F, p. 28, 12F, p. 15 and 20F, p. 40). The claimant denied symptoms of fatigue, weakness and tiredness (Ex. 20F, p. 28), and reported no functional concerns or needs involving eating, dressing, walking or using the bathroom (Exs. 3F, p. 42 and 20F, p. 30). Although the claimant was found to have some mobility and sensory abnormalities, his gait and station was normal and he did not require a handheld

assistive device. There was no atrophy in the claimant's hands and his grip strength was equal and normal bilaterally. While he had decreased range of motion in his lumbar spine, straight leg raises were negative (Ex. 9F). Accordingly, the claimant's allegation regarding the severity of his physical impairments is partially credible.

As for the opinion evidence, on September 13, 2007, Dr. Cindy Osborne reviewed the evidence and opined that the claimant was capable of no more than light exertion except he could never climb ladders, ropes or scaffolds, never balance, and must avoid exposure to extreme temperatures , wetness, humidity, fumes, odors, dusts, gases, poor ventilation and hazards (Ex. 11F). Although the undersigned gives significant weight to Dr. Obsorne's assessment, the undersigned finds that the claimant's true functional abilities at this time are more accurately reflected in the assessment of Dr. Fulvio Franyutti.

On November 29, 2007, Dr. Fulvio Franyutti reviewed the evidence and opined that the claimant was capable of no more than light exertion except the claimant could never climb ladders, ropes or scaffolds, crouch or crawl, could occasionally perform all other postural activities, and must avoid exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation and hazards (Ex. 16F). Dr. Franyutti's assessment takes into account the claimant's subjective complaints of pain and the nature and symptoms resulting from the claimant's impairments. Additionally, Dr. Franyutti's assessment is consistent with the claimant's mobility and sensory abnormalities, as well as the claimant's normal gait, station and grip strength. Dr. Franyutti's assessment is also consistent with the claimant's extensive activities during the period in question. As discussed above, the claimant walked every day (Exs. 3F, p. 35 and 8F, p. 63), worked doing remodeling, did mechanical work on a friend's car, and worked as a security guard. He helped a friend with construction, and loaded and drove an ice cream truck for seven hours a day, seven days a week (Ex. 3F, p. 28, 12F, p. 15 and 20F, p. 40). The level of physical exertion required for such activities suggests that the claimant is capable of the light exertion described above. Accordingly, Dr. Franyutti's assessment is given great weight.

(Tr. 873-82.)

## IV. Conclusions of Law

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards.

Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case de novo, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy

12

that accommodate the claimant's residual functional capacity . . . ." Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ significantly misrepresented and/or mischaracterized critical evidence of record regarding the severity of Plaintiff's impairments and the credibility of his allegations. Specifically, Plaintiff argues that the ALJ improperly used an onset date of January 1, 2003, when she was aware that Plaintiff had amended his onset day to March 2, 2006. (Tr. 873, 893.) Additionally, he argues that the ALJ ignored an "extremely significant" MRI report from March 2, 2006, that revealed "significant degenerative disc disease," (Doc. No. 14-1 at Page ID 1951), and relied, instead, on X-rays from 2002, nearly four years prior to Plaintiff's onset date, and a CT scan and MRI from 2009, outside the period under review.

The March 2, 2006, MRI report notes that: "[T]here is normal alignment of the lumbar vertebral bodies but, there is significant degenerative disc disease at L2/L3, L3/L4 and a milder form of degenerative disc disease at L4/L5 and L5/S1." (Tr. 275.) The report goes on to note that the L1/L2 disc space is "dehydrated" but that there is "no evidence of any disc herniation or protrusion" and the central canal[4] and neural foramina[5] appear "normal." (Id.) The L2/L3 disc space shows a "marked decrease in disc space height with diffuse disc bulge" which causes "mild canal stenosis" and "mild neural foraminal narrowing" (Id.) With respect to L3/L4, "the area of dominant finding . . . there is a broad based disc bulge that causes moderate right neural foraminal narrowing and central spinal stenosis." (Id.) The report goes on to state that this

---

[4] The "central canal" is a "minute canal running through the gray matter of the whole length of the spinal cord and continuous anteriorly with the ventricles of the brain." "Central Canal." *Merriam-Webster.com*. Merriam-Webster, n.d. Web. (last visited Mar. 3 2017)

[5] The neural foramina is an opening between two spinal vertebrae. Intervertebral foramina, https://en.wikipedia.org/w/index.php?title=Intervertebral_foramina&oldid=726494871 (last visited Mar. 3, 2017).

14

"dominant finding is likely a bulging disc at L3/l4 which significantly narrows [the] right neural foramen and central spinal canal. (Tr. 276.) With respect to L4/L5 and L5/S1, there is mild disc bulge, and specifically with respect to L4/L5, mild central stenosis." (Tr. 276.)

While this report was not cited by the ALJ, that fact alone does not establish that she did not consider the report. See Thacker v. Comm'r of Soc. Sec., 99 F. App'x 661, 665 (6th Cir. 2004) (recognizing that "ALJ need not discuss every piece of evidence in the record for his [or her] decision to stand.") Moreover, even though the ALJ cited to the X-rays from 2002 and a CT scan and MRI from 2009, she noted that this imagining "showed degenerative disc disease." To be sure, the March 2, 2006 MRI Report was more specific in its findings regarding Plaintiff's degenerative disc disease, ultimately however, it was consistent with the ALJ's finding.[6] Further, nothing in the March 2, 2006 report is contrary to the ALJ's RFC finding that Plaintiff can undertake work which requires a "reduced range of light exertion." (Tr. 880.)

Additionally, in arguing that the ALJ failed to consider the severity of his degenerative disc disease, Plaintiff relies on the findings reported by Stephen Nutter, M.D.,[7] who conducted the consultative examination. (Doc. No. 14-1 at Page ID# 1951). The ALJ also expressly relied on Dr. Nutter's findings noting that Dr. Nutter found that Plaintiff had "decreased range of motion in his lumbar spine," but his "straight leg raises were negative," and Plaintiff "ambulated

---

[6] Plaintiff takes issue with the ALJ's statement that medical imaging showed "mild scoliosis," however, Plaintiff has never raised scoliosis as an impairment. Moreover, the March 2, 2006 MRI Report's finding that "[t]here is normal alignment of the lumbar vertebral bodies" suggests that scoliosis was not a significant problem for Plaintiff.

[7] The Appeals Council directed the ALJ to confirm that Dr. Nutter was a licensed physician at the time he conducted Plaintiff's consultative examination, which she did. (Tr. 877; see also, Tr. 1904.)

with a normal gait and station and did not require a handheld assistive device." (Tr. 879.) The ALJ also found that "[m]edical records list the claimant's chronic low back pain as stable, and document decreased pain with [the] use of the TENS unit." (Tr. 879.)

Nevertheless, to the extent that the ALJ erred by using and citing to medical imagining that was outside the period of review, such error was harmless. Even assuming arguendo, that the ALJ did not consider the March 2, 2006 report, there is nothing in the March 2, 2006 report, which pre-dates Dr. Nutter's report by nearly one and one-half years, that suggests the ALJ would have arrived at a different disability determination. See Kobetic v. Comm'r of Soc. Sec., 114 F.App'x 171, 173 (6th Cir. 2004 (concluding that it "would be an idle and useless formality" to remand to the SSA where "there is [no] reason to believe that [it] might lead to a different result"); Precaj v. Holder, 376 F.App'x 553, 559–60 (6th Cir. 2010) (stating, that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result" (internal citation omitted)).

In sum, substantial evidence supported the ALJ's finding regarding the impact of Plaintiff's degenerative disc disease on the RFC assessment. To the extent the ALJ erred in considering evidence outside the period of review, such error was harmless.

Plaintiff next contends that the ALJ failed to comply with the Appeal's Council's Remand Order. Specifically, Plaintiff argues that the ALJ failed to consider Plaintiff's black out spells, diabetic neuropathy and pancreatic impairments when she made her RFC finding.

Courts have routinely held that it is beyond the scope of the District Court's authority to review whether an ALJ's post-remand decision complies with the specific provisions of the Appeals Council's remand order. See, e.g., Burke v. Comm'r of Soc. Sec., No. 1:13-CV-96, 2014 WL 2895460, at *6 (E.D. Tenn. June 25, 2014) (listing cases); Fajardo v. Astrue, No. CV 08–01615 AJW, 2010 WL 273168, at *3 (C.D. Cal. Jan.14, 2010) (finding that "regardless of whether the ALJ fully complied with the Appeals Council's remand order, judicial review is limited to the question whether the ALJ's decision is supported by substantial evidence and reflects application of the correct legal standards."); Riddle v. Astrue, No. 2:06–00004, 2009 WL 804056 (M.D. Tenn. Mar. 25, 2009) (concluding that "[b]ecause the district court does not review internal, agency-level proceedings, it will not address whether the ALJ complied with the specific provisions of the Appeals Council's order of remand."); Brown v. Comm'r of Soc. Sec., No. 1:08CV183, 2009 WL 465708, at *6 (W.D. Mich. Feb. 24, 2009) (recognizing that "[w]hether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision.") Further, by declining a claimant's request for review of the ALJ's post-remand decision, the Appeals Council "implicitly found that its earlier remand order had been followed." Balde v. Astrue, No. 10-C-0682, 2011 WL 3419371 at *17 (E.D. Wis. Aug. 4, 2011) (quoting Walker v. Astrue, No. 08–3666, 2009 WL 3160165, at *15 (E.D. La. Sept. 29, 2009)); see also Brown, 2009 WL 465708 at *6 ("By failing to remand the matter a second time, it appears that the Appeals Council considered the ALJ's [post-remand decision] to be in compliance with the Council's previous order of remand."). But, even if it were appropriate for this Court to review whether the ALJ's

post-remand decision complied with the Appeals Council's mandate, the ALJ's decision here establishes that she fully complied with the remand order.

The ALJ specifically considered each of Plaintiff's identified impairments, and made findings as to the impact of those impairments on Plaintiff's functioning. The ALJ considered Plaintiff's "poorly controlled diabetes" and noted that there was "no evidence that [his] diabetes caused a substantial functional limitation during the period in question." (Tr. 877.) Additionally, the ALJ found that Plaintiff's medical records suggested that "abnormalities associated with the claimant's diabetes were largely attributable to periods in which the claimant failed to properly adhere to his treatment regimen. (Tr. 878.) [8] The ALJ considered Plaintiff's "history of blackout spells" and noted that "medical records suggest that [Plaintiff's] black out spells are associated with periods of uncontrolled blood sugar." (Tr. 878.) For example, the ALJ noted that on November 1, 2006, Plaintiff visited the Diabetes Clinic with reports of blackouts, but admitted that he had "decreased his insulin . . . and had not been using the aspart." (Id.) By

---

[8] Although the ALJ cited a few instances where medical records showed that Plaintiff was refusing to comply with his treatment protocol, there were others. See e.g. Tr. 234-236 (March 1, 2007, Nursing Note— glucometer not working, but declined new one; Diabetes Clinic—"has not been monitoring much;" Endocrinology Consult—"stopped the insulin regimen I recommended"); Tr. 252 (November 24, 2006, Diabetes Clinic—in connection with blood glucose self-monitoring: "no results or meter again"); Tr. 253 (November 1, 2006, Diabetes Clinic—in connection with blood glucose self-monitoring: "no results or logbook—insisted he bring it to next appt"); Tr. 254 (November 2, 2007, Diabetes Clinic Addendum—"[p]honed pt to emphasize the need for consistency in diet and insulin dose"); Tr. 259 (September 14, 2006, Diabetes Clinic—"Thought his meter was malfunctioning, but found he had been adjusting his doses . . .. Did not start the regimen provided by endocrinologist on 7/27/06; has not used aspart . . .;" "Needs close follow up to evaluate . . . glu results and adherence to plan . . ." ); Tr. 556 (October 24, 2007 at 20:54, Emergency Room—states, "I haven't taken any of my diabetic pills of insulin since this morning."); Tr. 560 (October 23, 2007, Diabetes Clinic—in connection with blood glucose self-monitoring: "No written results. Discussed possible causes of hypoglycemia and need for more frequent monitoring and recording of results for endocrinology follow up").

contrast, at his November 24, 2006, visit, the Plaintiff reported that "he was taking his medication as directed and no hyperglycemia or blackouts since his last appointment." (Id.)

The ALJ considered Plaintiff's recurrent pancreatitis, pancreatic pseudocyst and hypothyroidism and noted, with respect to the pancreatitis and the hypothyroid conditions, that they were well controlled when Plaintiff was compliant with his medication regimen, and that the pseudocyst was minimally symptomatic and stable. (Tr. 879; see also Tr. 272 (November 1, 2006, CT Scan of Abdomen—pseudocyst "unchanged since May 26, 2006"); Tr. 255 (October 13, 2006—"He denies any change in his chronic right-sided back pain which he thinks [ ] is skeletal in origin and not related to pseudocyst" and "He has minimal if any symptoms attributable to his pseudocyst").

The ALJ considered the opinions of the non-treating sources, including Cindy Osborne, D.O. and Fulvio Franyutti, M.D., and she explained the weight given to each providers' opinion.[9] Specifically, while the ALJ gave significant weight to Dr. Osborne's assessment, she credited Dr. Franyutti's assessment for being more accurate and thus, entitled to "great weight." (Tr. 880-81.) The ALJ explained that she gave great weight to Dr. Franyutti's assessment because it "takes into account the claimant's subjective complaints of pain and the nature and symptoms resulting from the claimant's impairments." (Tr. 881.) Additionally, "Dr. Franyutti's assessment is . . . consistent with the claimant's extensive activities during the period in question." (Id.)

---

[9] There were additional non-treating sources, but they focused on Plaintiff's mental health, which Plaintiff never identified as impairment and which the mental health sources concluded was not an impairment. Tr. 284-96; 572.

The ALJ independently analyzed the evidence of record and, citing to the supporting evidence in the record, determined Plaintiff's RFC. Furthermore, the ALJ evaluated the Plaintiff's subjective complaints and explained why she found Plaintiff's "allegations regarding the severity of his physical impairments [only] partially credible." (Tr. 880.) Plaintiff complains that the ALJ cited to "isolated references" in the record regarding his level of activity and impairment. However, as noted above, the ALJ is not required to cite to every piece of evidence in the record. See Thacker, 99 F. App'x at 665 (recognizing that "ALJ need not discuss every piece of evidence in the record for his decision to stand.") Moreover, the extent to which Plaintiff's daily activities are referenced in the record is not so "isolated" as Plaintiff suggests. See Tr. 221 (April 12, 2007, Diabetes Clinic—under Exercise: "Delivering ice and working on truck"); Tr. 235 (March 1, 2007, Diabetes Clinic—under Exercise: "Does chores for landlady, walks 5 miles per day just for exercise."); Tr. 236 (March 1, 2007, Endocrinology Consult— "The patient reports no pain (pain score 0/10); Tr. 251 (November 24, 2006, Diabetes Clinic— under Exercise: "Helping daughter and landlady"); Tr. 253 (November 1, 2006, Diabetes Clinic—under Exercise: "Walks dog for a few hours, works doing remodeling, security work last night); Tr. 256 (October 13, 2006, Diabetes Clinic—under Exercise: "Walking dog 4-5 hours some days, estimates 4-6 miles usually); Tr. 259 (September 14, 2006, Diabetes Clinic—under Exercise: "Walking 2.5+ miles with dog before and after breakfast"); Tr. 565 (July 10, 2007, Primary Care Clinic—"suggesting obtaining a pedometer and walking 10K steps most day of the week"); Tr. 569 (June 12, 2007, Diabetes Clinic—under Exercise: "Driving ice cream truck for about 7 hour[s] daily, 7 days a week. Walks in AM").

20

Finally, Plaintiff claims that the ALJ failed to properly evaluate and assess his credibility as required by SSR 96-7p. Although the ALJ, not the court system, is tasked with evaluating a witness' credibility, credibility findings must be "grounded in the evidence and articulated in the determination or decision." SSR 96-7P, 1996 WL 374186 at *4 (July 2, 1996); Rogers v. Commissioner, 486 F.3d 234, 247 (6th Cir. 2007). In addition to the objective evidence, the ALJ should consider the following factors when assessing the credibility of a claimant's statements regarding her symptoms:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P, 1996 WL 374186 at * 3. Under SSR 96–7p the ALJ is required to "consider" the seven-listed factors, but there is no requirement that the ALJ discuss every factor. See White v. Commissioner, 572 F.3d 272, 287 (6th Cir. 2009); see also Coleman v. Astrue, No. 2:09–cv–36, 2010 WL 4094299, at * 15 (M.D. Tenn. Oct.18, 2010) (finding that "[t]here is no requirement [ ] that the ALJ expressly discuss each listed factor."); Roberts v. Astrue, No. 1:09–cv–1518, 2010 WL 2342492, at * 11 (N.D. Ohio June 9, 2010) (finding that "the ALJ need not analyze all seven factors contained in SSR 96–7p to comply with the regulations").

Credibility determinations concerning a claimant's subjective complaints are within the province of the ALJ. See Gooch v. Secretary of Health & Human Servs., 833 F.2d 589, 592 (6th Cir.1987). The Court does not make its own credibility determinations. See Walters v. Commissioner, 127 F.3d 525, 528 (6th Cir. 1997). The SSA's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." Ulman, 693 F.3d at 714; see Warner, 375 F.3d at 392 (noting that credibility findings made by the ALJ are given great deference.). "Claimants challenging the ALJ's credibility determination face an uphill battle." Daniels v. Commissioner, 152 F. App'x 485, 488 (6th Cir. 2005); see Ritchie v. Commissioner, 540 F. App'x 508, 511 (6th Cir. 2013) (recognizing that "[w]e have held that an administrative law judge's credibility findings are 'virtually unchallengeable.'") "Upon review, [the Court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the Court] d[oes] not, of observing a witness's demeanor while testifying." Jones, 336 F.3d 469, 476 (6th Cir. 2003).

The Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable." Rogers, 486 F.3d at 248. The Rogers court observed that Social Security Ruling 96–7p requires that the ALJ explain his or her credibility determination and that the explanation "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Rogers, 486 F.3d at 248.

The ALJ's discussion of Plaintiff's credibility began with the relevant regulations and social security rulings, including SSR 96–7p. (Tr. 876.) The ALJ's reference to SSR 96–7p "indicates that she 'considered' all the ruling's factors." Brown v. Commissioner, No. 1:10–cv–705, 2012 WL 951556, at * 5 (W.D. Mich. Feb 27, 2012). The ALJ observed that the medical evidence supported her finding that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and that she "gave some weight to the claim's testimony in finding him capable of no more than the reduced range of light exertion." (Tr. 877, 880.) Nevertheless, she found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC]." (Tr. 877.) The ALJ then set forth the evidence that led her to this finding. She noted that the abnormalities associated with Plaintiff's diabetes, black out spells and hypothyroidism, were well controlled when Plaintiff properly adhered to his treatment regimen (Tr. 880.) Additionally, the record evidence revealed gaps in the claimant's complaints about black out episodes "suggest[ing] that his blackouts were not as severe as alleged." (Id.) The evidence also revealed that while the Plaintiff "was found to have some mobility and

sensory abnormalities, his gait and station was normal and he did not require a handheld assistive device. There was no atrophy in the claimant's hands and his grip strength was equal and normal bilaterally. While he had decreased range of motion in his lumbar spine, straight leg raises were negative." (Id.) Further, the evidence established that Plaintiff's "COPD and pseudocyst were stable, and that [Plaintiff's] pancreatitis has been responsive to treatment." (Id.) Finally, Plaintiff's "extensive activities of daily living are not reflective of the incapacitating limitation alleged." (Id.) As is manifest, the ALJ sufficiently complied with the requirements of SSR 96-7p when she explained her factual findings regarding crediting Plaintiff's testimony as being only partially credible.

In sum, Plaintiff's claims of error have no merit, and the decision of the ALJ is supported by substantial evidence on the record as a whole. Accordingly, the ALJ's decision will be affirmed.

## V. Conclusion

In light of the foregoing, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED. An appropriate order is filed herewith.

THOMAS A. WISEMAN, JR.
SENIOR DISTRICT JUDGE